## Southern Ry. Co. et al. v. Stanaford's Adm'x.

(Decided Oct. 21, 1938.)

A. M. WARREN, EDWARD P. HUMPHREY and TYE, SILER, GILLIS & SILER for appellants.

J. B. JOHNSON, L. O. SILER and STEPHENS & STEELY for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Reversing.

Jicie Adkins, daughter of George Stanaford, and administratrix of his estate, sought recovery in the sum of $25,110 on account of the death of her intestate, and loss to the estate of certain personal property, due to the alleged negligence of the defendants below, now appellants.

The injury occurred March 7, 1936. The Louisville & Nashville Railroad is the owner of certain railway tracks in Whitley County, and leased the use of the tracks to its co-defendant, over which the Southern Railway was operating one of its trains at the time of the accident. Appellee charged that on the date mentioned, and while her intestate was using ordinary care for his safety in passing over a crossing, his wagon was struck by an engine, and so injured him that he died shortly thereafter.

She alleged that the crossing was an unusually dangerous one because used by a great number of people at all times of the day and was located in a deep cut, so that the whistle or bell of an approaching engine could not be easily heard; that being on a curve a train approaching from the northeast could not be seen by a traveler "until said train is less than 300 feet of the point where her intestate suffered his injury."

The petition specifically plead that the injury occurred because "said defendant, its agents and servants failed to keep a lookout for persons using the crossing; negligently operated its train at a dangerous rate of speed as it approached the crossing, and that the operators of the train failed to ring a bell or sound a whistle, continuously or alternately for a certain distance until the engine had reached the crossing."

The two appellants filed joint answer, in which they controverted, and then alleged contributory negligence.

A proper reply joined the issue. Upon submission a jury returned a verdict for appellee in the sum of $4,000, and judgment was accordingly entered. Motion for a new trial was overruled and appeal granted.

At the time of his death deceased was seventy-one years of age. He lived on a farm in Whitley County, about five miles from Jellico. On the morning of the da*e mentioned he had gone to Jellico, driving a pair of mules hitched to an ordinary farm wagon. There he had made some purchases of merchandise, and started home. The accident occurred near one p. m. Near the point where the road (we use the word "road" to distinguish it from Highway 25-W) crosses the tracks, there appear to be two main tracks of the Louisville & Nashville, over one of which the Southern was operating the train causing the injury. Both tracks have a general bearing north and south, and converge at a point about 130 feet northeast of the center of the crossing, and trains going south run over this track. There is a side track over the crossing parallel with the main, both crossing the highway at right angles. On the east side of the tracks, near the point of accident, the highway runs almost parallel to the tracks.

At the crossing the road turning from the highway runs in a northerly direction. The distance from the west edge of the highway to the east rail of the main track is approximately sixty feet. The road is level with the tracks. The highway is some 18 or 20 feet higher than the tracks at the crossing. When the tracks were laid, in order to reach the proper grade, it was necessary to cut around the lower side of a hill, making a side cut of 17 or 18 feet, with a fill on the east side of the tracks.

The track on which the train was approaching the crossing makes a seven degree curve toward the east, on the north side of the crossing, and one turning into the road from the highway cannot see the approaching train for any great distance, though one proceeding on the road can see it for a distance of approximately 430 feet or more. There was the usual standard railroad crossing sign.

The train which caused the injury to deceased was going south, and deceased was traveling northwardly, and very shortly after turning off the highway his

wagon was struck by the engine, demolishing the wagon and so injuring him that he died shortly thereafter.

Counsel for appellant contends that the judgment below should be reversed on the following grounds:

(1) Appellant was entitled to a peremptory instruction because of insufficient proof upon which to submit the case to the jury, and failing in this the court should have set aside the verdict, because flagrantly against the evidence.

(2) The court erred in submitting to the jury the question as to whether or not the crossing was an unusually dangerous one, there being insufficient proof upon which to submit.

(3) Error in submitting to the jury the question as to whether proper lookout was maintained; failure to give statutory signals, and in submitting on the last clear chance theory.

On the day of the accident the train was composed of an engine, baggage car, and two coaches; a "light train." The crew consisted of the engineman, fireman, conductor, flagman and baggagemaster. The run was from Knoxville through Jellico to Fondee (on this day) back to Jellico and thence to Knoxville.

Robert Taylor was traveling the highway, and got on the wagon of deceased at the outskirts of Jellico. He got out of the wagon just as deceased made the turn to go over the crossing, and witness started down the highway, his position throwing the crossing slightly back of him. He says he was paying little attention, and did not see the train until it was within 30 or 40 feet of the crossing. He guessed the train was running about thirty miles an hour. His position on the highway would not permit him to see the engine until some time after it had passed the break in the curve. He stated that when he first saw the train, and then looked toward the crossing, the mules had just crossed the main track and were on the "dirt road," and so remained until the engine struck the wagon. This witness says that before he saw the train deceased was standing up in the wagon and whipping his mules with a switch, which continued until he got on the main track when his mules "bucked" on him; that one of the mules was "balky" and had stopped before this time. This was the mule next to the train, and was the one injured.

Wes Smiddy was going to his home, traveling the railroad, and had gotten three or four hundred feet from the crossing, traveling north. This position would throw him with his back to the crossing. Some women were also traveling the track and were closer to the crossing. He heard the whistle blow, and woman scream; he looked back, and was able to see the crossing and saw deceased going across the main track. "He had the check lines in his hand, and was whipping the mules with his right hand." He says the team was then moving, and the engine "was just coming around the curve." The two mules cleared the track, and "it looked to me like the wagon was struck about midway of the front wheels." He says the engine whistle blew "around back of the curve," but did not blow any more. He could not state whether or not the bell was ringing, but says it was ringing after the train hit the wagon. He estimated that when the woman screamed, the engine was between 150 or 200 feet from the crossing. He says deceased was watching his mules and he did not see him look toward the train. When he first saw deceased whipping the mules "his wagon was on the storage track and his mules had just started on the main track."

J. B. Smiddy was sitting by the "dirt road bridge" fishing, at the time of the accident, about fifty to seventy-five yards from the crossing, on the west side of the track. He says the whistle blew around the curve, "somewhere about Matt Rose's, and never blowed no more after it got to the curve." He never noticed the ringing of the bell until after the train stopped. After the engine whistled "I saw the old man standing on the crossing whipping his mules." He never noticed deceased looking toward the train. "The mules stopped; he was trying to get them to pull. He just hung up there on the crossing."

Other witnesses testify substantially to the same effect, and from their testimony it is made doubtful if there was a constant or alternate giving of what is termed "statutory signals."

Herbert Faulkner was walking home on the highway, and had gotten beyond the crossing somewhere near Matt Rose's. This witness is the first to develop that the tracks cross the highway somewhere near Rose's home. He heard the engine blow "somewhere

near that crossing.'' He says if the engine whistle blew between that point and the crossing, he did not hear it, nor did he hear the bell ring.

On the question of statutory signals, the trainmen, and perhaps others who were in a position to observe, say that the required signals were given. It appears from the evidence that some two thousand or more feet north of the crossing this main track crosses the highway. The engineer says he sounded the whistle for this crossing, then gave the whistle for Jellico station, some two thousand or more feet south of the road crossing, and then again for the road crossing. He testified that his bell was operated automatically, and he opened the bell-ringing valve at Fondee, and the bell continued to ring until he reached Jellico. He explained this by saying that between the two points there were several crossings, and mining camps along the tracks. In these statements he was borne out by the fireman. In addition there were some by-standers who say the whistle blew somewhere in or near the curve, just north of the crossing.

Six or more persons, some of whom were passengers on the train, riding in one coach or the other, testify that they did not hear the whistle blow for the road crossing, nor did they hear any ringing of the bell before it reached the crossing. Some of the number heard the whistle for the highway crossing, but not afterwards. One says that the bell did not ring as the crossing was approached. Another witness who was driving a truck along the highway, heard the whistle for the highway crossing, but did not hear the bell ringing, which he says could have been heard by him if it were ringing.

As to the matter of performance of lookout duty, it may be said that there is no satisfactory evidence to contradict the engineer or fireman on this point, both of whom testify that they did observe this duty. From the situation, as we gather it, the engineer had to depend largely upon the fireman until the engine cleared the curve. The fireman, as is admitted, could see some portion of the crossing at a distance of about four hundred and twenty feet. He and the engineer said they came around the curve at ''restricted'' speed; under control, with brakes on. The fireman had to be, and says he was,

on lookout, not only for the crossing but for the switch which led onto the main track, about one hundred and twenty or more feet north of the crossing. The engineer called to the fireman "How's everything" and the fireman answered "all right," evidently referring to the switch. The engineer then gave the engine some steam; "it exhausted five or six times," when the fireman observed deceased and his team, and called to the engineer to look out, and the engineer at once applied his brakes. The train ran about 320 feet and came to a stop after striking the wagon. Many of the witnesses, who were passengers, agree that the brakes were applied; some say the train "eased down"; another that the engineer used good judgment in stopping the train "as quick as he could." The fireman said that he could get a good view of the crossing when about 300 feet away; he saw the wagon and team about 30 feet from the main track; deceased was looking toward the train and was whipping his mules.

The only testimony as to the failure to observe the lookout was on the part of two persons some distance away, who were in a position to see the engine. They merely say they did not see the fireman or engineer; one witness was on the right and the other on the left of the engine. We are of the opinion that this contrary proof was insufficient to justify the giving of a "failure of lookout" instruction.

What is said of the proof in regard to failure to do lookout duty is applicable to the instruction with respect to the alleged "unusually dangerous crossing." Much argument is indulged in the brief, attempting to carry conviction that this crossing was unusually dangerous, since one approaching the crossing had his view obstructed because the train approached the crossing around a curve, and beyond the elevation or hill. The test generally is the ability of the traveler to be able to observe the approach of the train from the direction in which it is coming. Justice's Adm'r v. Chesapeake & Ohio Railway Company, 244 Ky. 168, 50 S. W. (2d) 531. From all the proof here it seems to us that the physical situation was such that a traveler could see the trains approach for a distance of approximately four hundred feet, and in going in the direction in which deceased was traveling, it was possible for him to see that distance for some time before he reached the track on which the

train was approaching. Stephenson's Adm'x v. Sharp's Ex'rs. See 222 Ky. 496, 1 S. W. (2d) 957.

This brings us to the consideration of the contention of appellant that the court erred in giving the instruction on the last clear chance, or discovered peril theory. We think in giving this instruction the court was in error. As indicated in the outset, the appellee chose in his pleading to plead specific omissions. The petition contains no general allegation of negligence. There is no plea of discovered peril; no plea that peril might have been discovered by the exercise of ordinary care, in time to have prevented the injury. Thus it is clear that under the criticized instruction, the jury was authorized to find a verdict for appellee, upon an issue which was not plead. We have frequently held an instruction of this kind, in the absence of pleading, to be error. Manwaring v. Geisler, 191 Ky. 532, 230 S. W. 918, 18 A. L. R. 192; Id., 196 Ky. 110, 244 S. W. 292; Barksdale's Adm'r v. Southern Railway, of Kentucky, 199 Ky. 592, 251 S. W. 656. The case of Hopper v. Barren Fork Coal Company, 263 Ky. 446, 447, 92 S. W. (2d) 776, relied on with some emphasis by appellee, is distinguishable, mainly because of the admission of the train operators that they observed the peril in time to avert the collision which caused Hopper's injury.

On the whole case we are of the opinion that the court committed error in the respects pointed out. Since it is impossible for this court to anticipate what the proof may develop on another trial, all questions, other than those directly decided, are reserved.

Judgment reversed with directions to grant appellant a new trial consistent with this opinion.